1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ANGELA FELDMANN,

                  Plaintiff,

      v.

LAKEVIEW LOAN SERVICING
LLC, et al.,

                  Defendants.

CASE NO. C20-580 MJP

ORDER GRANTING IN PART
DENYING IN PART
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

       This matter comes before the Court on Defendants' Motion for Summary Judgment.

(Dkt. No. 16.)  Having read the Motion, the Response (Dkt. No. 19), the Reply (Dkt. No. 23),

and the related record, the Court GRANTS the Motion in part and DENIES the Motion in part.

## Background

       Plaintiff, Angela Feldmann, purchased her home for $151,210.00 in January 2017

through a loan from Axia Financial, LLC.  (Dkt. No. 17, Declaration of Allison Bielby ("Bielby

Decl."), Ex. A.)  Shortly thereafter, Axia sold the servicing rights to Defendant Lakeview Loan

1   Servicing, LLC, which then transferred subservicing rights to Defendant, Loancare, LLC. (Dkt.

2   No. 19, Declaration of Saraellen Hutchison ("Hutchison Decl."), Ex B at 36:22-37:7.)

3       In August 2017, Ms. Feldmann took medical leave from work and stopped receiving

4   income. (Hutchison Decl., Ex. C ("Feldmann Dep.") at 22:19-23:9.) When she was no longer

5   able to make her monthly mortgage payments in November, 2017, Defendants referred the loan

6   to a local foreclosure firm. (Bielby Decl., ¶ 9.)

7       After denying her first request for a loan modification, Defendants eventually entered

8   into a modified loan contract with Plaintiff in January 2019. (Id. at 73:10-22, 74:16-75:5.)

9   Plaintiff made her trial plan payments and the modified loan contract was signed on July 22,

10   2019. (Id. at 74:24-75:6; Dkt. No. 17, Declaration of Allison Bielby ("Bielby Decl."), Ex. B.)

11   The loan modification was recorded with Pierce County in August 2019. (Bielby Decl., ¶ 9.)

12       But LoanCare failed to enter the loan modification into its system until September 2019,

13   and continued sending Plaintiff monthly bills at her previous rate. (Bielby Decl., ¶ 9; Hutchison

14   Decl., Ex. A at 7.) Plaintiff also testified that she received statements late, sometimes listing an

15   increased payment, so she "never knew how much would be owed, not to mention fees that

16   [Defendants] would continually add, that [she] was unaware of. To this date, [she's] unaware of

17   what all of them are." (Feldmann Dep. at 26:17-25.)

18       And although Plaintiff made each of her trial and modified loan payments on time,

19   Defendants continued to erroneously report her as delinquent until December 23, 2019. (Id.,

20   ¶ 13; Bielby Decl., Ex. C.) In fact, Defendants continued to report Plaintiff as delinquent even

21   after both Plaintiff and the credit bureaus requested corrected information. On September 7,

22   2019, Plaintiff wrote to one credit bureau, Equifax Information Services, LLC, to dispute

23   Defendants' reports that she was not paying her monthly mortgage. (Hutchison Decl., Ex. A at

24

17-18.)  On September 10, 2019 Plaintiff also notified Defendants that her monthly statements reflected her pre-modification loan payment, and that Defendants were "inaccurately reporting missed payments every single month to all 3 CRA's and have done so throughout the entire Trial Payment Period that lasted 4 months." (Id. at 58.)  Defendants acknowledged receipt of Plaintiff's letter but did not provide a substantive response.  (Id. at 55; Bielby Decl., Ex. C.)  And on October 7, 2019, LoanCare confirmed to Equifax the erroneous information that Plaintiff had missed payments in the previous months.  (Hutchison Decl., Ex. A at 87.)  LoanCare also confirmed its erroneous reporting to TransUnion on October 16, 2019.  (Id. at 90-91.)

Plaintiff wrote additional letters to Defendants on October 27, 2019 and November 12, 2019, asking Defendants to correct their monthly reporting.  (Hutchison Decl., Ex. A at 111-135, 139.)  But Defendants continued to falsely report that Plaintiff was delinquent.  (Hutchison Decl., Ex. A at 142-43.)  On November 29, 2019 Defendants reported to Equifax that Plaintiff was delinquent while inexplicably reporting on the same day to Experian that Ms. Feldmann was current.  (Id. at 144-45.)  On December 2, 2019, in response to a request for information from TransUnion, Defendants confirmed the false information again.  (Id. at 145-46.)

It was not until January 3, 2020 that LoanCare sent Ms. Feldmann a letter acknowledging that her billing statements through the spring and summer had "not yet adjusted to reflect the loan modification."  (Bielby Decl., Ex. C.)  The letter acknowledged that payments had been misapplied as principal curtailment payments, LoanCare had erroneously assessed late payments, and that LoanCare did not submit corrections to all four major credit bureaus until December 23, 2019, months after Plaintiff's request.  (Id.)

In September 2019, before Defendants' erroneous reporting was corrected, Ms. Feldmann attempted to buy a used car.  (Feldmann Dep. at 89:18-20.)  She was turned away from multiple

1   dealerships and testified that she was only able to obtain a loan—at 12.5% interest—after

2   providing proof that she had been paying her mortgage in the previous months.  (<u>Id.</u> at

3   110:23-111:5.)  This interaction was embarrassing to Ms. Feldmann and "made her feel small."

4   (<u>Id.</u> at 111:6-8.)

5        On March 13, 2020 Plaintiff filed this action in King County Superior Court, alleging

6   violations of the Fair Credit Reporting Act ("FCRA"), Washington Consumer Protection Act

7   ("CPA"), Real Estate Settlement Procedures Act ("RESPA"), Fair Debt Collection Practices Act

8   ("FDCPA"), and breach of the modified loan contract.  (Dkt. No. 1, Ex. 2 ("Compl.").)

9   Defendants removed the action to this Court on April 16, 2020.  (Dkt. No. 1.)

10       Defendants now seek summary judgment on all claims.  (Dkt. No. 16.)  Plaintiff has

11   agreed to dismiss her FDCPA claim but contests the remainder of Defendants' Motion.  (<u>Id.</u>)

12                                **Discussion**

13   **I.      Legal Standard**

14       Summary judgment is proper if the pleadings, depositions, answers to interrogatories,

15   admissions on file, and affidavits show that there is no genuine issue of material fact and that the

16   moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The movant bears

17   the initial burden of demonstrating the absence of a genuine dispute of material fact.  <u>Celotex</u>

18   <u>Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  A genuine dispute over a material fact exists if there

19   is sufficient evidence for a reasonable jury to return a verdict for the non-movant.  <u>Anderson v.</u>

20   <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 253 (1986).  A mere scintilla of evidence supporting the

21   nonmovant's position is insufficient to withstand summary judgment; there must be evidence on

22   which the jury could reasonably find for the nonmovant.  <u>Id.</u> at 252.

23   //

24

## II.     Defendants' Motion to Strike

Defendants move to strike seven categories of testimony or argument from Plaintiff's

Response and supporting exhibits.  (Dkt. No. 23 at 1-2.)  Because "[a] trial court can only

consider admissible evidence in ruling on a motion for summary judgment," the Court begins by

evaluating the statements at issue.  Orr v. Bank of Am., NT & SA, 285 F.3d 764, 773 (9th Cir.

2002).

Defendants move to strike the following as hearsay: (1) the credit reports Plaintiff

accessed online (Hutchison Decl., Ex. F, part one at 2-18, 23-107; id., part two at 1-26, 31-57,

63-73); (2) credit denials from third-party financing companies (Id., Ex. F part one at 20-21; id.

part two at 29-30, 58-60; Feldmann Dep. at 63, 89-93); (3) anonymous complaints pulled from

the Consumer Financial Protection Bureau website (Id., Ex. D); (4) complaints from customers

on a Facebook page (Dkt. No. 19 at 7); and (5) Defendants' Rule 30(b)(6) witness's deposition

answers regarding credit reports provided by Plaintiff's attorney (Id., Ex. B at 80-81, 102-103).

Additionally, Defendants move to strike the assertion that they report credit on "thousands of

consumers nationwide" as unsupported (Dkt. No. 19 at 14).  Because each of these assertions are

hearsay or unauthenticated, and Plaintiff has provided no information that would permit these

statements and evidence to be introduced through a hearsay exception, the Court STRIKES these

statements.

But Defendants also move to strike Plaintiff's citation to Myfico.com, which explains

various factors that affect a credit score, "like time since delinquency."  (Dkt. No. 19 at 13.)

Because this citation is no different than a citation to other websites and has been cited by other

courts, see, e.g., Cortez v. Trans Union, LLC, 617 F.3d 688, 697 (3d Cir. 2010), the Court

DENIES the Motion to Strike as to this statement.

### III.   **Defendants' Motion for Summary Judgment**

Defendants seek summary judgment on Plaintiff's four remaining claims: (1) for violations of the FCRA; (2) RESPA; (3) for breach of the modified loan contract; and (4) for violations of the Washington CPA.

### A.  Fair Credit Reporting Act

Under subsection 1681–2(b) of the FCRA, after receiving a notice of dispute, the furnisher of information to a credit bureau is required to conduct a reasonable investigation with respect to the disputed information and report the results of the investigation back to the credit bureau.  Gorman v. Wolpoff & Abramson, LLP, 584 F.3d 1147, 1154 (9th Cir. 2009) (citing § 1681s–2(b)(1)).  If the investigation finds that the information is incorrect or inaccurate, the furnisher of information must report these results to all credit bureaus to which the person furnished the information.  Id. at 1157.  "The FCRA expressly creates a private right of action for willful or negligent noncompliance with its requirements."  Id.

1. False Reporting

Defendants first argue that the derogatory credit reporting for the months of July, August, and September 2019 "was not necessarily false, as the modification was not finalized and recorded with the County until August, and not implemented into the system until the following month."  (Dkt. No. 16 at 12.)  Defendants' obligations to report correct information does not depend on when they updated their system and their argument ignores their obligations to conduct a reasonable investigation under the FCRA.  See Gorman, 584 F.3d at 1154.

Defendants were notified of a dispute on September 10, 2019, with Plaintiff writing that Defendants were "inaccurately reporting missed payments every single month to all 3 CRA's and have done so throughout the entire Trial Payment Period that lasted 4 months."  (Id. at 58.)

1  Yet LoanCare confirmed the erroneous report on October 7, October 16, November 29, and

2  December 2, 2019, even after receiving many letters from both Plaintiff and the credit bureaus

3  throughout this period. (Hutchison Decl., Ex. A at 87, 90-91, 144-46.)  In fact, LoanCare did not

4  correct its inaccurate reporting until December 23, 2019.  (Id.)  From this, a reasonable jury

5  could certainly find that LoanCare failed to conduct any investigation—let alone a reasonable

6  one—into the disputed reporting—and violated the FCRA.

7      2.  Damages

8      Defendants also argue that Plaintiff cannot demonstrate economic or emotional distress

9  damages. (Dkt. No. 16 at 12-13.)  "The FCRA provides for compensation in the form of actual

10  damages and attorneys' fees if a consumer reporting agency negligently fails to comply with any

11  provision of FCRA." Guimond, 45 F.3d at 1332 (citing 15 U.S.C. § 1681o). "In addition, a

12  consumer can recover punitive damages for willful non-compliance." Id. (citing 15 U.S.C.

13  § 1681n).  The Court finds that the evidence would permit a reasonable juror to conclude that

14  Defendants' negligent and even willful violations of the FCRA caused Plaintiff harm.

15      When Plaintiff tried to buy a used car, she was turned away from multiple dealerships

16  and eventually received a loan—at 12.5% interest—only after providing proof that she had been

17  paying her mortgage in the previous months. (Id. at 110:23-111:5.)  She testified that this was

18  embarrassing and "made her feel small." (Id. at 111:6-8.)  Further, Defendants' actions in failing

19  to correct the false reporting or conduct a reasonable investigation, even after several months of

20  receiving letters and requests from both Plaintiff and the credit bureaus, also likely entailed "an

21  unjustifiably high risk of harm that is either known or so obvious that it should be known,"

22  therefore suggesting willful non-compliance with the requirements of the FCRA.  Safeco Ins. Co.

23  of Am. v. Burr, 551 U.S. 47, 71 (2007).

24

1        3.  Vicarious Liability

2        Finally, Defendants argue that Lakeview itself did not make any false reports to credit

3   bureaus; the reports were all made by Lakeview's sub-servicer, LoanCare.  (Dkt. No. 16 at 12.)

4   "The Ninth Circuit Court of Appeals has not determined whether a party can be liable under the

5   FCRA on a vicarious liability theory" Kwang Kim v. Wilmington Tr. Co., No. 17CV528-WQH-

6   AGS, 2018 WL 4296983, at *8 (S.D. Cal. Sept. 7, 2018), but "[t]he existence of a

7   principal-agent relationship is ordinarily a question of fact for the trier of fact to resolve"  See

8   Krueger By and Through Krueger v. Mammoth Mountain Ski Area, Inc., 873 F.2d 222, 223 (9th

9   Cir. 1989).

10       Here, Plaintiff notes that LoanCare is a sub-servicer whose authority stems from

11  Lakeview, the two companies put forth a single 30(b)(6) witness who testified that LoanCare

12  "does all the duties as a servicer on behalf of [Lakeview]," and Plaintiff's erroneous mortgage

13  statements and QWR response came from Lakeview.  (Hutchison Decl., A at 65, 108, Ex. B at

14  17:19-23.)  Because a reasonable juror could determine that Lakeview maintained control over

15  LoanCare throughout this process, the FCRA claim will proceed against Lakeview.

16       **B.  Real Estate Settlement Procedures Act**

17       Defendants next argue that Plaintiff's RESPA claim against both Defendants fails

18  because Plaintiff "makes vague and conclusory allegations without specifics" and only LoanCare

19  is the authorized loan servicer.  (Dkt. No. 16 at 13.)  RESPA requires any servicer of a federally

20  related mortgage loan who receives a qualified written request ("QWR") from the borrower to

21  provide a written response acknowledging receipt of the correspondence within 5 days.  12

22  U.S.C. § 2605(e)(1).  Not later than 30 days after the receipt of a QWR, the servicer must make

23  appropriate corrections in the account of the borrower, including crediting any late charges or

24

ORDER GRANTING IN PART DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
- 8

1   penalties, and transmit to the borrower a written notification of such correction.  12 U.S.C.

2   § 2605(A).  And during the 60-day period following the receipt of a QWR, the servicer must

3   cease all derogatory reporting to any consumer reporting agency regarding any overdue payment

4   and relating to the QWR.  12 U.S.C. § 2605(e)(3).

5          Plaintiff sent her first QWR to Defendants on September 10, 2019.  (Id. at 58.)

6   LoanCare's evidence establishes that it failed to stop its derogatory reporting following receipt of

7   the QWR and failed to correct its previous false reporting for more than three months afterward.

8   (Bielby Decl., Ex. C.)  LoanCare also failed to notify Plaintiff of any appropriate corrections

9   until January 3, 2020, well outside the 30-day window required by the statute.  (Id.)  These

10  actions and omissions violate RESPA.

11         Failure to comply with the requirements of RESPA exposes a servicer to an award of

12  "actual damages" resulting from the failure and "any additional damages, as the court may allow,

13  in the case of a pattern or practice of noncompliance with the requirements of this section, in an

14  amount not to exceed $2,000."  12 U.S.C. § 2605(f)(1).  Further, "RESPA permits recovery of

15  emotional distress damages."  Moon v. GMAC Mortg. Corp., No. C08-969Z, 2009 WL 3185596,

16  at *5 (W.D. Wash. Oct. 2, 2009); Lucero v. Cenlar FSB, No. C13-0602RSL, 2015 WL 5024047,

17  at *3 (W.D. Wash. Aug. 25, 2015).

18         Plaintiff contends she incurred damages as a result of the violation, including the time

19  and effort required to write additional letters to ensure Defendants complied with their

20  obligations.  (Dkt. No. 19 at 16-17.)  She has also provided evidence of emotional distress,

21  testifying she remained "terrified" she would lose her home during this period, was depressed

22  and felt "powerless about it, because [she] felt like it was just a matter of time that they were

23  going to take [the home], because they kept doing it.  It continued.  It didn't end.  It was

24

1    concerning, extremely concerning." (Feldmann Dep. at 102:22-103:3.) This is sufficient

2    evidence for a reasonable jury to return a verdict for Plaintiff.

3           Defendants also argue that Lakeview cannot be liable for the RESPA violations because

4    LoanCare was tasked with servicing the loan. While the Ninth Circuit has not addressed whether

5    vicarious liability applies to RESPA claims, courts in other circuits have addressed the issue and

6    concluded that it does. The Court finds the reasoning in Rouleau v. US Bank, N.A., No. 14-CV-

7    568-JL, 2015 WL 1757104, at *7 (D.N.H. Apr. 17, 2015) persuasive:

8           The Supreme Court has held that RESPA creates "a species of tort liability." City
            of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 709 (1999) . . .
9           [the] Court has long assumed that "when Congress creates a tort action, it
            legislates against a legal background of ordinary tort-related vicarious liability
10          rules," and consequently, that its statutorily-created torts "incorporate those
            rules." Meyer v. Holley, 537 U.S. 280, 285 (2003).

11
12   The Court finds that RESPA allows vicarious liability and the issue of whether a principal-agent

     relationship exists between LoanCare and Lakeview will be decided by the jury.
13
           **C.  Washington Consumer Protection Act**
14
           Plaintiff alleges that Defendants violated the CPA by "unfairly and/or deceptively
15
     enter[ing] into a loan modification contract with Plaintiff and then act[ing] like the loan
16
     modification had never occurred"; failing to timely notify Plaintiff about changes to the amount
17
     of her mortgage payment; refusing to apply Plaintiff's payments to her mortgage, instead placing
18
     the funds in a "suspense" account while adding late fees and attorneys' fees; and keeping
19
     attorneys' fees with no explanation, even after admitting its errors in its January 3, 2020 letter.
20
     (Compl., ¶¶ 8.4-8.8.)
21
           The CPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or
22
     practices in the conduct of any trade or commerce." RCW 19.86.020. A private cause of action
23
     exists under the CPA if (1) the conduct is unfair or deceptive, (2) occurs in trade or commerce,
24

1    (3) affects the public interest, and (4) causes injury (5) to plaintiff's business or property.

2    Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wash.2d 778, 780 (1986).

3             Defendants argue the CPA is not implicated because their conduct—"voluntarily

4    modifying Feldmann's loan, bringing it current, and preventing a residential foreclosure and

5    eviction—was a public good."  (Dkt. No. 16 at 10.)

6             Where the Defendants' own evidence establishes that they falsely reported Plaintiff as

7    delinquent to the credit bureaus, among other violations, and the Washington State Legislature

8    has declared "that consumers have a vital interest in establishing and maintaining

9    creditworthiness," Defendants' behavior can hardly be described as a public good.  RCW

10   19.182.005.  In fact, Washington courts have concluded that violations of Washington's Fair

11   Credit Reporting Act constitute per se violations of the public interest element of the CPA.

12   Handlin v. On-Site Manager Inc., 187 Wash. App. 841, 848 (2015); see also 31 Wash. Prac.,

13   Business Law 19.182.005 (2021 ed.) ("Washington's Fair Credit Reporting Act complements the

14   Federal Fair Credit Reporting Act.").  A reasonable jury could conclude that Defendants'

15   violations of the FCRA and RESPA, and explanation that these violations were "minor hiccups,"

16   "without consequence," caused by a system delay, demonstrate the very conduct the Legislature

17   meant to discourage when it enacted the CPA.

18           **D.  Breach of Contract**

19           In order to prevail on a breach of contract claim under Washington law, a party must

20   establish that (1) a duty imposed by the contract (2) was breached, with (3) damages proximately

21   caused by the breach.  Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus., 78 Wn. App. 707, 712

22   (1995).  Plaintiff argues that Defendants breached the modified loan contract when they

23   continued to demand payment under the old terms and did not apply Plaintiff's timely payments

24

properly to the loan.  (Dkt. No. 19 at 23.)  But neither Plaintiff's Complaint nor her briefing refer to a provision of the contract that was breached, and the contract does not contain promises that Defendants would send accurate statements each month or apply Plaintiff's payments in a timely manner.  Plaintiff's claim for breach of contract is therefore DISMISSED.

Lakeview also contends it is entitled to fees under the attorneys' fees provision of the original loan contract. (Dkt. No. 16 at 14 (citing Bielby Decl., Ex. A, ¶ 28).)  But fees are mandatory only when "[t]he contract containing the attorney fees provision [is] central to the controversy." CHD, Inc. v. Boyles, 138 Wash. App. 131, 141, (2007) (citing Hemenway v. Miller, 116 Wash.2d 725, 742 (1991).  Because Plaintiff's complaint is primarily focused on the statutory violations, and her breach of contract claim concerns the modified contract, it cannot be said that the original contract is central to the controversy here.  Defendants' request for attorneys' fees is DENIED.

### Conclusion

In sum, the Court:

> (1) DENIES in part, GRANTS in part Defendants' Motion to Strike;

> (2) DENIES Defendants' Motion for Summary Judgment as to Plaintiff's FCRA, RESPA, and Washington CPA claims;

> (3) GRANTS Defendants' Motion for Summary Judgment as to Plaintiff's breach of contract claim; and

> (4) DENIES Defendants' request for attorneys' fees.

//

//

//

The clerk is ordered to provide copies of this order to all counsel.

Dated April 27, 2021.

Marsha J. Pechman
United States Senior District Judge